**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMMODITY FUTURES
TRADING COMMISSION,

                    Plaintiff,

v.

TFS-ICAP, LLC, TFS-ICAP LTD., IAN DIBB,
and JEREMY WOOLFENDEN,

                    Defendants,

**Civil Action No. 18-cv-8914**

**ECF Case**

**JURY TRIAL DEMANDED**

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY**
**PENALTIES, AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission (the "CFTC" or "Commission"), by

and through its undersigned attorneys, hereby alleges as follows:

**I.  SUMMARY**

1.      For over seven years, TFS-ICAP, LLC and TFS-ICAP Ltd. (together,

"TFS-ICAP") brokers routinely attempted to deceive—and did deceive—their clients by

communicating to them fake bids and offers and fake trades in the foreign exchange ("FX")

options market.  TFS-ICAP brokers did this with the tacit approval of senior managers at TFS-

ICAP, including the Chief Executive Officer ("CEO"), Ian Dibb.

2.      The practice of communicating fake bids and offers—bids and offers that were

not from any trading institution, but rather were made up by the broker—is known among

brokers in the FX options industry as "flying prices" or "flying rates."  The practice of

communicating fake trades—specifically, communicating that a trade had occurred at a certain

time and price level when it had not—is known as "printing" or "calling" trades.  By flying

prices and printing trades, brokers at TFS-ICAP intended to create an illusion of greater liquidity and tighter spreads on TFS-ICAP's trading platform and induce clients to transact via TFS-ICAP's platform and brokers.

3.      From at least 2008 to 2015 (the "Relevant Period"), flying and printing were core elements of TFS-ICAP's broking activity in the United States and the United Kingdom. Throughout the Relevant Period, TFS-ICAP brokers flew prices and printed trades to clients over the phone line, instant message, and on Volbroker, TFS-ICAP's proprietary electronic trading platform.  To fly prices and print trades on Volbroker, TFS-ICAP brokers used what was known as a "TFS alias."  The TFS aliases allowed brokers to populate the Volbroker trading screen with bids and offers that were not real but appeared to clients as tradable prices.  The TFS aliases also allowed brokers to match these fake bids and offers with each other, causing the Volbroker screen to flash and give clients the false impression that a trade had occurred.

4.      Certain senior managers at TFS-ICAP knew or had constructive knowledge that brokers at TFS-ICAP regularly flew prices and printed trades throughout the Relevant Period but did nothing to prevent or deter these deceptive practices.  Such senior managers included (1) Jeremy Woolfenden, who at all relevant times was the Global Head of Emerging Markets broking at TFS-ICAP; and (2) Ian Dibb, the CEO of TFS-ICAP from approximately 2011 to 2017.

5.      In addition, in or about early 2015, TFS-ICAP brokers in New York began flying prices and printing trades in the name of a CFTC-registered swap dealer ("Bank A"), without Bank A's knowledge or consent.  By March of 2015, Woolfenden was aware of this conduct and did not do anything to prevent it or hold those engaging in the conduct accountable.

6.     When it came to the attention of Dibb that New York brokers were using Bank A's name to fly prices and print trades, Dibb was far more concerned with the possibility that this conduct—and the broader practices of flying and printing—would become public knowledge than he was with holding individuals accountable or investigating the scope of wrongdoing.  To that end, Dibb and others undertook efforts to pass off the fake trades in Bank A's name as legitimate.  Moreover, as described below, Dibb and others associated with TFS-ICAP took affirmative steps to prevent government authorities, including the CFTC, from discovering the full extent of flying and printing at TFS-ICAP.

7.     From at least 2012 through August 2015 (the "Charging Period"), following the effective date of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. 111-203, H.R. 4173 (the "Dodd-Frank Act"), and its related regulations, TFS-ICAP brokers' conduct described herein violated Sections 4b(a)(2), 6(c)(1), and 4c(a)(1)-(2) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2), 9(1), 6c(a)(1)-(2) (2012), and Commission Regulation ("Regulation") 180.1, 17 C.F.R. § 180.1 (2018), to the extent such conduct was directed in part at or related to the solicitation of or formation of FX Options contracts with U.S. persons.

8.     The brokers engaged in the conduct described herein within the scope of their employment with TFS-ICAP.  Accordingly, TFS-ICAP is liable for these violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012).  TFS-ICAP is also liable under Regulation 166.3, 17 C.F.R. § 166.3 (2018), for its failure to supervise broker conduct.

9.     From at least 2012 through August of 2015, Dibb and Woolfenden each controlled broker activity at TFS-ICAP in both London and the United States.  This control, combined with (a) their knowledge or constructive knowledge of conduct described herein and

(b) their failure to maintain a reasonably adequate system of supervision, gives rise to their liability for all the underlying violations pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b) (2012).

10.    Their failure to develop and implement procedures designed to detect and deter flying and printing also gives rise to liability under Regulation 166.3.

11.    By encouraging U.S. and London-based brokers to fly prices and print trades throughout the Relevant Period, Woolfenden aided and abetted such activity, giving rise to his liability for all the underlying violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a) (2012).

12.    Plaintiff CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), to enjoin Defendants' violative acts and practices and to compel Defendants' compliance with the Act.  In addition, Plaintiff CFTC seeks civil monetary penalties and such other equitable relief, including but not limited to disgorgement, as this Court deems necessary and appropriate.

## II.  JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

14.     Venue properly lies with this Court, pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e) (2012), because the Defendants transacted business in this District and acts and

practices in violation of the Act occurred in this District.  Venue is also proper pursuant to 28

U.S.C. § 1391(c)(3) (2012).

### III.  PARTIES

15.     **Plaintiff Commodity Futures Trading Commission** is an independent federal

regulatory agency that is charged by Congress with the administration and enforcement of the

Act and Regulations promulgated thereunder.

16.     **Defendants TFS-ICAP, LLC** and **TFS-ICAP Ltd.** are the U.S. and U.K.

entities, respectfully, constituting a joint venture between Tradition Financial Services, ICAP

plc, and Volbroker.com, Ltd.  TFS-ICAP, LLC has been registered with the CFTC as an

Introducing Broker since January 2013.  TFS-ICAP Ltd. has been registered with the CFTC as

an Introducing Broker since November 2015.

17.     **Defendant Jeremy Woolfenden** has, since at least 2007, been the Global Head of

Emerging Markets FX Options at TFS-ICAP.  Since at least 2007, he has also been an active

broker of certain emerging market FX options.  Woolfenden has been registered with the CFTC

as an Associated Person of TFS-ICAP Ltd. since November 2015.  From December 2014 to

October 2016, Woolfenden was registered with the CFTC as an Associated Person of TFS

Derivatives Ltd.

18.     **Defendant Ian Dibb** has been the CEO of TFS-ICAP since 2011.  Prior to

becoming CEO, he brokered foreign exchange options in G10 currency pairs on TFS-ICAP's

London desk.  Dibb was registered with the CFTC as an Associated Person and listed as a

Principal of TFS-Derivatives Ltd. from approximately December 2014 to October 2016 and May

2014 to October 2016, respectively.  Dibb has been registered with the CFTC as an Associated

Person of TFS-ICAP Ltd. since November 2015 and listed as a Principal since July 2015. He

has been listed as a Principal of TFS-ICAP, LLC since May 2014. From at least 2013 to 2016,

Dibb was one of three Tradition Financial Services-affiliated directors of TFS-ICAP, LLC.

## IV. FACTS

**Organizational Background**

Formation of TFS-ICAP

19.     TFS-ICAP, LLC was formed in 2000 by the merger of the FX options divisions of

Tradition Financial Services, Inc. ("Tradition") and ICAP plc ("ICAP").

20.     In 2001, Volbroker.com Ltd. became the owner of a 49% stake in TFS-ICAP,

LLC. The remaining 51% was owned by TFS-ICAP Holdings LLC ("Holdings"). Tradition

owned 55% of Holdings, and therefore a 28% share of TFS-ICAP, LLC. ICAP owned 45% of

Holdings, and therefore a 23% share of TFS-ICAP, LLC.

21.     According to the 2001 agreement between Holdings and Volbroker Group, the

Board of TFS-ICAP, LLC was to be made up of ten individuals—six from Holdings and four

from Volbroker.

22.     Moreover, according to a 2001 agreement between Tradition and ICAP, the Board

of Holdings was to consist of six individuals—up to three appointed by Tradition and up to three

appointed by ICAP. Furthermore, these individuals would also serve as Holdings'

representatives on the TFS-ICAP, LLC Board.

23.     The 2001 agreement between Holdings and the Volbroker Group stated that the

"day to day running of the Company shall be delegated to and shall be the responsibility of the

[Holdings board members]."

24.     The 2001 agreement between Tradition and ICAP stated that the Holdings board

"shall have responsibility for the supervision and management of the Company and its business

including, without limitation, decisions made by the Company in its capacity as a member in TFS-ICAP LLC."

25.     TFS-ICAP Ltd.'s ownership and board structure is analogous to that of TFS-ICAP, LLC.

26.     U.S.-based brokers were employed by TFS-ICAP, LLC.

27.     U.K.-based brokers were employed by TFS-ICAP Ltd.

28.     While TFS-ICAP, LLC and TFS-ICAP Ltd. are separate legal entities, at all times during the Relevant Period, they were treated as one company.  There was only one CEO, to whom both London- and U.S.-based brokers reported.  TFS-ICAP's Global Head of Emerging Markets also oversaw the emerging markets brokers in London and the United States, and reported to the CEO.

<u>TFS-ICAP Offices</u>

29.     Throughout the Relevant Period, TFS-ICAP's London business was housed in Tradition's London offices.  The London business consisted of a G10 desk, an exotics desk, and an Emerging Markets desk that brokered Central and Eastern European, Middle East, and African ("CEEMEA") currency pairs.  The Emerging Markets desk also brokered Chinese currency pairs during London trading hours.  From January to June 2014, U.S. clients of TFS-ICAP's Emerging Markets FX options business were serviced by brokers in TFS-ICAP's London offices.

30.     Until 2013, TFS-ICAP's U.S. operations were divided between ICAP's offices in New Jersey and Tradition's offices in New York.  Specifically, the G10 and exotic FX options business was housed in Tradition's offices in New York and the Emerging Markets FX options business was housed in ICAP's offices in New Jersey.  This Emerging Markets desk in New

Jersey mainly brokered Latin American FX options ("LATAM").[1]  In January 2013, the

Emerging Markets desk moved from ICAP's offices in New Jersey to Tradition offices in New

York, placing all of TFS-ICAP's U.S. operations inside Tradition's office in New York.  Since

2013, in addition to broking LATAM FX options, the Emerging Markets desk in New York has

also brokered Chinese currency pairs during part of the New York trading day.

**FX Option Contracts and TFS-ICAP's Trading System**

Foreign Exchange Option Contracts

31.     A foreign exchange option ("FX option") is, in its most basic form, a right to

exchange one currency for another at a pre-agreed conversion rate, on a set date in the future or

over a set period of time.  The price, or cost, of the option is called the premium.  However,

unlike stock options, for example, which are quoted in terms of the premium, market convention

dictates that FX options are quoted in terms of implied volatility, which is expressed as a

percentage.  When traders place bids and offers for FX options, these bids and offers are

expressed in terms of implied volatility.

32.     Accordingly, to enter into an FX options transaction, traders agree on an implied

volatility level, not a dollar amount.  After they agree on an implied volatility level at which to

transact, that volatility level—along with other inputs such as the spot and forward rate[2]—is put

into an options pricing tool which computes the actual premium paid from the buyer of the

option to the seller.

33.     The right to buy a currency at a set rate on some future date is referred to as a

"call" option.  The right to sell a currency at a set rate on some future date is referred to as a

---

[1]     The vast majority of LATAM currency option trading consisted of USD/MXN (Dollar / Mexican Peso) and USD/BRL (Dollar / Brazilian Real) currency pairs.

[2]     There are widely published market rates for the spot and forward rates, so it is extremely rare that traders would negotiate over them.

"put" option.  Multiple call and put options can be—and often are—combined and traded together.  Examples of such combinations include "straddles," "butterflies," and "risk reversals."

Volbroker

34.     At all times during the Relevant Period, Volbroker was the proprietary electronic trading platform for FX options used by brokers at TFS-ICAP and made available to TFS-ICAP clients (traders).  The platform allowed clients to post live bids and offers for FX options in a variety of currency pairs, options strategies, and tenors.  (The "tenor" of an option refers to the length of time before it expires (e.g., 1 week, 1 month, 3 months, 6 months, 1 year, etc.).)  The platform also allowed brokers to post such bids and offers on a trader's behalf.  Each best bid and offer for each particular option appeared in its own tile (box) in a bid-offer grid on the users' screens.  The bids and offers were anonymous, except to the brokers, who were able to see which institution was behind each one.  Moreover, each trader was able to identify which bids and offers, if any, had been posted by a broker on his or her behalf.

35.     If a trader—or a broker on a trader's behalf—wanted to trade on a particular bid or offer posted on the Volbroker screen, he could simply click on it and enter the volume he wanted to trade at that level.[3]  This would result in a flash on the Volbroker screen, notifying users that the option had traded at that particular volatility level.  It also resulted in the basic trade details appearing in a "trade ticker," which was also visible to users.

36.     Only after the trade flash occurred, and the trade appeared in the ticker, did the parties to the trade learn each other's identity and agree on further details such as the spot and forward rate.  As mentioned above, these "details" were very rarely disputed or negotiated.  It was even rarer still for a trade to fall apart because of a disagreement over the details.

---

[3]     "Level" refers to volatility level.  As explained above, bids and offers are expressed in terms of volatility.

37.     TFS-ICAP brokers had a list of bank names on the side of their Volbroker screens.  These were called bank "aliases."  To post a bid or offer on behalf of a trader at a particular bank, the broker clicked on the alias of that bank and then posted the price (i.e., volatility level) in the tile corresponding to the currency pair and tenor the trader desired to bid or offer.  Similarly, to hit or lift an existing price on behalf of a trader at a bank, the broker would click on that bank's alias and then click on the tile of the option that trader wanted to transact upon.

38.     Starting in or around 2005, certain "TFS" aliases were added to the alias list. Rather than being limited to posting prices under the alias of a trading institution, brokers were then able to post prices under aliases such as "TFS-NY" (TFS-New York), "TFS-LDN" (TFS-London), and "TFS-FFT" (TFS Frankfurt).

39.     As a broker, however, TFS-ICAP was simply an intermediary between two trading parties; it could not be a counterparty to an FX options transaction.  Accordingly, if a trader acted upon a TFS-alias's bid or offer it would not constitute a genuine transaction.

40.     By the terms of the Volbroker User Agreement and Volbroker User Guide, traders were led to believe that all bids and offers on the Volbroker screen were bona fide and binding bids and offers posted by other trading institutions.

**Broker Misconduct**

Flying

41.     From at least 2008 and continuing through at least 2015, it was common practice for TFS-ICAP brokers in both London and New York to communicate non-bona fide bids and offers to their clients.  Specifically, brokers would represent to clients that there were bids or

offers for an option at a particular level when, in fact, no trading institution had bid or offered the option at that level.

42.     This practice was referred to in the FX options brokerage industry as "flying" prices.

43.     From at least 2008 and continuing through at least 2015, TFS-ICAP brokers flew bids and offers to clients over voice (phone), instant message ("IM"), and Volbroker on a daily basis.

44.     These brokers would fly bids and offers on Volbroker by posting them under one of the various "TFS" aliases (usually, TFSNY or TFSLDN).  Because the platform was anonymous, traders could not tell the difference between bids and offers that were flown by the brokers and bids and offers that were made by an actual trading institution.

Printing

45.     From at least 2008 and continuing through at least 2015, it was also common practice for TFS-ICAP brokers in both London and New York to communicate fake trades to clients—i.e., communicate that a trade had occurred when a trade had not, in fact, occurred.

46.     This practice was known in the industry as "printing," "spoofing," or "calling" a trade.

47.     From at least 2008 and continuing through at least 2015, TFS-ICAP brokers routinely printed trades over voice, IM, and Volbroker, sometimes multiple times per day.

48.     By printing a fake trade, the TFS-ICAP brokers often successfully induced traders to enter into real "follow-on" trades.

49.     TFS-ICAP brokers printed trades on Volbroker by using one TFS alias to aggress on a price posted under another TFS alias, causing a flash on the traders' Volbroker screens and signaling to them that a trade had occurred when one had not actually occurred.

50.     Causing two TFS aliases to transact against each other, however, was not the only way false trades were signaled on Volbroker.  Non-existent trades also flashed on clients' Volbroker screens when a trader aggressed upon a flown TFS price, behind which there was no actual counterparty.  While the broker may have later been able to find an actual counterparty, the Volbroker system signaled a trade before one had actually been agreed upon.

Intent and Materiality of Flying and Printing

51.     According to TFS-ICAP brokers who have cooperated with the CFTC Division of Enforcement (the "Division"), TFS-ICAP brokers' intent when flying prices and printing trades was to give clients the impression that there was more liquidity on TFS-ICAP's platform than there actually was and to induce traders to transact at times and prices that they would not otherwise have transacted.

52.     For example, TFS-ICAP brokers hoped that when they "printed" a trade, market participants would respond with requests to "follow on"—i.e., trade at the level the broker had falsely represented was trading.

53.     TFS-ICAP earned commissions off of trades executed on Volbroker or otherwise facilitated by TFS-ICAP brokers.  Each TFS-ICAP broker's compensation was directly tied to the amount of commissions attributable to his broking activity.

54.     Because it was the TFS-ICAP brokers' practice not to admit when they had flown rates, traders were not aware that many of the bids and offers they saw on Volbroker—or otherwise received—did not represent actual bids and offers from other traders.  Indeed,

12

Volbroker users were told by TFS-ICAP that the prices they saw on the screen were tradable. When a flown price was hit or lifted, brokers lied to maintain this illusion.

55.     If a TFS-ICAP broker got "paid" or "given" on a flown price, the TFS-ICAP brokers would scramble to find an actual counterparty to step into the trade.  If the broker was unable to find a counterparty he would lie—specifically, make up an excuse—to the trader to cover up the fact that the original bid or offer was not real.

56.     In such scenarios, brokers would tell traders, for example, that they got "double hit," that the spot rate had moved (if it had), or that the other trader had stepped off the desk. Brokers did not admit to traders that the bid or offer was never actually there in the first place.

57.     Traders were also not aware that many of the trades announced over voice and IM, as well as many of the trades flashing on the Volbroker screen, did not signify actual trades. When they saw the Volbroker screen flash or read in a chat that a trade had occurred, traders believed that an actual trade had occurred at the time and level indicated.

58.     Believing that the pricing and trade information communicated to them was an accurate representation of market interest and activity, at least some traders used the bids, offers, and trades they saw on Volbroker in their proprietary pricing models.

59.     The tradability of bids and offers on the screen was important to traders; at least some would get upset at brokers if a price they aggressed on turned out not to be available.

60.     The trades communicated by TFS-ICAP brokers were particularly important pieces of information to traders.  Knowledge (actual or perceived) that two parties had consented to trade an option at a particular level carried substantial weight in a trader's determination of what the fair market value was for that option and other related options.

61.     Generally, the false impression of liquidity created by TFS-ICAP brokers

succeeded in attracting more client eyes to the Volbroker screen and caused traders to transact

via TFS-ICAP more than they would have if prices were not flown or if trades were not printed.

**History and Breadth of Misconduct**

<u>The Origins of the Practices of Flying Prices and Printing Trades on TFS-ICAP's U.S. Emerging Markets Desk</u>

62.     In 2007, TFS-ICAP's LATAM Emerging Markets broking business was housed

in ICAP's offices in New Jersey.  At the time, ICAP provided administrative services to the

LATAM desk (e.g., IT and human resources), and ICAP exercised a degree of managerial

control over the desk.

63.     In February of 2007, Woolfenden, the Global Head of TFS-ICAP's Emerging

Markets business, traveled to ICAP's offices in New Jersey.  The purpose of his trip was to

evaluate TFS-ICAP's LATAM business, which had been struggling.

64.     As a result of this trip, Woolfenden concluded that a main reason for the LATAM

desk's poor performance was that the brokers were not filling the Volbroker screen with bids and

offers.  Specifically, they were not flying enough prices—or any prices—on the Volbroker

screen.  Doing so, in his view, was necessary to attract traders' attention to the screen and

thereby increase business.

65.     Indeed, flying prices and printing trades were, at this time, already common

practices on other desks at TFS-ICAP, including but not limited to Woolfenden's Emerging

Markets desk in London.

66.     On March 12, 2007, Woolfenden circulated a written memo to senior TFS-ICAP

officials recommending that LATAM brokers fly prices.  Indeed, the memo suggested that flying

prices was a critical way to win more business.

67.     Woolfenden's memo explicitly stated that he was "asking the [co-manager of the LATAM desk] to start flying rates."[4]

68.     Woolfenden not only recommended that the LATAM brokers fly prices, but that they fly "tight" prices that had a higher chance of getting hit by the traders.  Woolfenden acknowledged the "risk" involved in such a practice—specifically, the risk that the flown prices would be hit and the brokers would not be able to find an actual counterparty—and therefore suggested that the brokers "prepare excuses" to be given to the traders that hit the flown prices.

69.     Moreover, the memo stated that if the LATAM desk did not implement his recommended changes and turn business around, "day to day running" of the LATAM business would be turned over to Tradition-affiliated TFS-ICAP management.

70.     The two co-managers of the LATAM desk at the time—who were legacy ICAP employees—proved reluctant to adopt Woolfenden's more aggressive broking practices.

71.     Woolfenden immediately began to undermine the co-managers by reaching out to junior brokers on the LATAM desk to teach them how to fly prices and print trades.

72.     On March 14, 2007, Woolfenden and a then-junior TFS-ICAP broker on the LATAM desk ("NY Broker A") exchanged instant messages about flying prices.  NY Broker A stated that one of the current co-managers "doesnt think its worth it [sic] . . . flying too many prices . . . worried we will lose credibility and money."  Woolfenden responded that flying prices was a necessary practice.

73.     In late 2007 and early 2008, Woolfenden followed through on his threat.  He stripped the co-managers of the LATAM desk of their managerial responsibilities and arranged for a veteran London broker with whom he had worked closely to take their place.  Woolfenden

---

[4]     In broker lingo, "flying rates" is synonymous with flying prices.

knew that the veteran London broker would fly prices and print trades in the regular course of business and encourage others on the LATAM desk to do so as well.

74.     Indeed, Woolfenden had encouraged the veteran London broker to fly prices and print trades while working in London.  On March 1, 2007, when the veteran London broker bragged about successfully printing a trade, Woolfenden responded, "nice."

75.     On April 24, 2008, as part of his continued effort to teach the LATAM brokers how to fly and print, Woolfenden again exchanged instant messages with NY Broker A. Woolfenden explained to NY Broker A how he "would have called"—i.e., printed—a particular option "paid" even though it had not actually traded.

76.      On or around May 2008, the veteran London broker (hereinafter, "NY Broker B"), who had been picked by Woolfenden to take over as manager of the LATAM desk, arrived in the U.S.

77.     NY Broker B acted as desk manager of the LATAM desk from 2008 to early 2014.  Throughout this period, he reported to Woolfenden.

78.     From 2008 to 2015, NY Broker A and NY Broker B, along with other brokers on the LATAM desk, frequently flew prices and printed fake trades to clients as they had been encouraged to do by Woolfenden.

TFS-ICAP Emerging Markets Brokers in the United States Embrace Flying and Printing;
The Practices Continue in New York and London

79.     Beginning in 2008, as a direct result of Woolfenden's and TFS-ICAP's control over the LATAM desk, brokers on that desk adopted the practices of flying prices and printing trades.

80.     The LATAM brokers flew prices and printed trades in the same way that the brokers in London did—in the way they were expected to by Woolfenden and TFS-ICAP.

81.     Following the effective date of the Dodd-Frank Act and relevant regulations, no policies were altered to prevent LATAM brokers from flying and printing, and the practices continued.

82.     From January 2013 through December 2014, TFS-ICAP's LATAM brokers in New York[5] posted over 25,000 LATAM FX option bids and offers using a TFS alias.  The vast majority, if not all, of these prices were flown—they did not represent an actual bid or offer from a trading institution.

83.     From January 2013 through September 2015, TFS-ICAP brokers in London also posted thousands of prices per month on Volbroker using one of the TFS aliases.  The vast majority, if not all, of these prices were flown—they did not represent an actual bid or offer from any trading institution.  Traders from U.S.-based institutions could view these prices on their Volbroker screen.

84.     From approximately January 2014 to June 2014, a number of brokers from TFS-ICAP's London desk assisted in broking LATAM FX options for U.S.-based clients.

85.     During this period alone, TFS-ICAP brokers posted over 6,900 LATAM FX option prices using a TFS alias.  The vast majority, if not all, of these prices were flown—they did not represent an actual bid or offer from a trading institution.

86.     From 2008 through 2015, TFS-ICAP's U.S.-based brokers also regularly printed trades over the phone, IM, and Volbroker.  These communications were directed at clients based in the U.S. and abroad.

---

[5]     By January 2013, the LATAM desk had relocated to Tradition's offices in New York.

87.     For example, on April 15, 2015, NY Broker B communicated to clients over IM that a 2-week USD/BRL option had traded at 17.0.  It had not actually traded at that level at that time.

88.     On May 12, 2015, NY Broker A communicated to clients over IM that a 1-month USD/MXN option had traded at 11.85.  It had not actually traded at that level at that time.

89.     On July 20, 2015, another New York-based TFS-ICAP broker ("NY Broker C") communicated to clients over IM that a 1-month USD/MXN option had traded at 9.35.  It had not actually traded at that level at that time.

90.     In the first half of 2014, TFS-ICAP's London-based brokers also printed trades in LATAM currency pairs while broking LATAM FX options for New York-based clients.  They did so over IM and on Volbroker.

91.     For example, on April 24, 2014, a TFS-ICAP London broker posted an offer for a 1-month USD/BRL option at 11.85 under the TFS-LDN alias.  NY Broker B subsequently hit the offer using the TFS-NY alias.  This caused the 1-month USD/BRL tile to flash on users' screens, indicating that a trade had occurred when it had not actually occurred at that time.  At approximately the same time, multiple London-based TFS-ICAP brokers communicated to New York-based clients that a trade had occurred at 11.85.

92.     An actual trade occurred at that level approximately twelve minutes later, indicating that the communication of the false trade induced traders to enter a real one.

93.     In the first half of 2014, TFS-ICAP brokers printed over thirty trades in LATAM currency pairs on Volbroker by matching two TFS aliases.

94.     Non-existent LATAM FX option trades also flashed on New York-based clients' Volbroker screens when a trader aggressed upon a flown TFS price, behind which there was no

actual counterparty.  While the broker may have later been able to find an actual counterparty, the Volbroker system signaled a trade before one had actually been agreed upon.

95.     In 2013 and 2014, this occurred over 200 times in LATAM currency pairs.

96.     For example, on April 4, 2014, a TFS-ICAP broker flew a bid on a 1-month USD/MXN option using the TFS-LDN alias.  The bid was subsequently hit by a New York-based trader, causing the Volbroker to show a trade before one had actually occurred.  Because there was no actual bid behind the TFS-LDN price, TFS-ICAP brokers scrambled to find an actual counterparty.  In soliciting other traders to step into the trade, TFS-ICAP brokers represented that they were in a jam because they had been "double given"—i.e., two traders had hit the bid at the same time.  They had not, in fact, been "double given."  At no time did the TFS-ICAP brokers admit to traders that the initial bid was flown.

97.     Approximately twenty minutes later, the brokers found an actual counterparty to execute the trade.

<u>The 2015 New York Emerging Market Conduct—Use of Bank A's Name</u>

98.     From at least January 2015 to August 2015, brokers on TFS-ICAP's New York Emerging Markets desk, including NY Broker A and NY Broker B, flew prices and printed trades in the name of Bank A, a CFTC-registered swap dealer, without Bank A's consent. Specifically, these brokers entered bids and offers on Volbroker using Bank A's alias despite the fact that Bank A had not actually given them any bids and offers.

99.     The New York Emerging Markets brokers knew that Bank A did not trade Emerging Markets FX options at the time and, therefore, that Bank A's traders were unlikely to notice the misuse of Bank A's alias on the system, minimizing the likelihood of getting caught.

100.    The New York Emerging Markets brokers flew over 3,000 prices in LATAM Emerging Markets currency pairs in Bank A's name on Volbroker.

101.    NY Broker B flew hundreds of prices in Chinese currency pairs using Bank A's name on Volbroker.

102.    Moreover, dozens of trades were printed to the market (i.e., flashed on Volbroker) as a result of a Bank A price being hit by traders or a TFS-ICAP broker.

**Senior Manager Responsibility for Misconduct**

<u>Senior Managers of TFS-ICAP Were Aware of, and Condoned, Flying and Printing During the Relevant Period</u>

103.    Throughout the Relevant Period, senior managers at TFS-ICAP, including Dibb and Woolfenden, were aware of and condoned the practices of flying and printing and allowed them to continue.

104.    Throughout the Relevant Period, Woolfenden flew prices and printed trades in CEEMEA currency pairs and others. For example, on March 4, 2015, Woolfenden entered a bid for a 1-month USD/TRY[6] option at 14.5 under the TFS-LDN alias.  Shortly thereafter, he aggressed upon that bid by entering an offer at the same level under the TFS-FFT alias.  This caused the 1-month USD/TRY tile on users' screens to flash, indicating that a trade had occurred at 14.5.  At approximately the same time, Woolfenden and other brokers on the London Emerging Markets desk communicated to clients over IM that the 1-month USD/TRY option had traded.  It had not actually traded at that level on that day.

105.    Throughout the Relevant Period, Woolfenden encouraged other TFS-ICAP Emerging Markets brokers to fly prices.  One way he encouraged brokers to fly prices was by "naming and shaming" the brokers who had put up the fewest prices under the TFS aliases.

---

[6]    USD/TRY is shorthand for the Dollar / Turkish Lira currency pair.

Under his leadership, it became a practice on the London Emerging Markets desk to circulate a report ranking brokers by how many prices they had posted under a TFS alias—a proxy for who had flown the most (and fewest) prices.  On at least one occasion in 2015, the New York brokers were told their respective rankings as well in order to incentivize them to fly more prices.

106.     On at least one occasion, in 2015, Woolfenden explicitly directed a TFS-ICAP broker to "never admit to clients that we have ever flown rates."

107.     Throughout the Relevant Period, Woolfenden also encouraged Emerging Markets brokers to print trades.  On the Emerging Markets desk in London, the decision to print trades was often made as a group, including Woolfenden.

108.     Throughout the Relevant Period, Woolfenden had access to, and viewed, the LATAM currency tiles, where he would have seen the prices flown and trades printed by New York Emerging Markets brokers and London brokers who were broking LATAM currency pairs.

109.     Woolfenden was aware of the New York Emerging Markets desk's use of Bank A's name to fly prices and print trades by March of 2015.

110.     Specifically, Woolfenden and other London brokers were present in a chat where NY Broker B openly discussed using Bank A's name to fly a price.

111.     Moreover, Volbroker trade data shows that Woolfenden and at least two other London brokers viewed and cancelled Bank A bids and offers posted by NY Broker A, sometimes replacing them with other flown prices using a TFS alias.

112.     Prior to becoming CEO of TFS-ICAP in or around 2011, Ian Dibb flew prices and printed trades as a G10 broker in London.

113.     Prior to 2011, when Dibb was also the manager of the G10 desk in London, he taught the junior brokers how to fly prices and print trades.

21

114.    As CEO, Dibb continued to be aware that TFS-ICAP brokers in London flew prices and printed trades because he frequently walked among the brokers, who spoke openly about "putting up" —i.e., flying—their own prices and communicating to clients trades that had not occurred.

115.    Moreover, in 2014 and 2015, Dibb and Woolfenden both knew or had reason to know that these practices continued in New York.

116.    On July 15, 2014, NY Broker A told Woolfenden that he had "seen a lot of flown runs" and questioned whether "we shud [sic] be flying that much in a SEF market."

117.    On July 16, 2014, NY Broker A emailed Woolfenden and Dibb to express concern about the amount of "calling"—i.e., printing—by TFS-ICAP brokers.  He stated, "I completely understand that some practices are necessary to uphold the perception of liquidity and our market share, it just needs to be done more carefully."

118.    Woolfenden responded that NY Broker A had made a "valid point" and forwarded his response to Dibb.

119.    Neither Woolfenden nor Dibb told NY Broker A or any other broker in New York to stop flying or printing.

120.    In 2014 and 2015, Woolfenden directly participated in the joint effort among the New York and London desks to broke Chinese currency pairs.  These efforts included regularly flying prices and printing trades to clients in London and New York.  Woolfenden was present for, and took part in, conversations in which TFS-ICAP brokers openly discussed flying prices and printing trades in Chinese currency pairs.

121.    On January 29, 2015, at a time when the LATAM business was struggling, NY Broker A messaged Woolfenden, offering to "start printing and flying more aggressively."

122.     On June 8, 2015, NY Broker A forwarded an email to Dibb and Woolfenden in which he suggested that the LATAM FX options desk in New York had been flying prices.

123.     Despite their knowledge or constructive knowledge that New York brokers and others at TFS-ICAP were flying prices and printing trades, neither Dibb nor Woolfenden took any affirmative steps to prevent or discourage the practice.

124.     Rather, the New York brokers understood that such practices were expected of them.

Dibb and Woolfenden Lacked Good Faith

125.     Woolfenden and Dibb exhibited a lack of good faith in connection with the conduct described above.

126.     As described above, Dibb and Woolfenden were explicitly notified on multiple occasions through June 2015 that TFS-ICAP brokers were flying prices and printing trades, yet did nothing to curtail the practice.

127.     On or prior to August 14, 2015, Dibb became specifically aware of the fact that New York brokers, including NY Broker A and NY Broker B, had flown prices and printed trades using Bank A's alias without its knowledge.

128.     In August or September of 2015, Dibb and others associated with TFS-ICAP undertook efforts to pass off the Bank A trades as legitimate.  Specifically, they looked for actual trades that had occurred at the same level on the same day so that, if ever questioned about the trades, they could say that the Bank A trades actually represented real trades in the market.

129.     NY Broker A and NY Broker B were not immediately terminated for flying prices and printing trades using Bank A's alias.

130.     Instead, Dibb suspended them for sixty days on or about August 20, 2015.

23

131.    Thereafter, Dibb deliberated for over two months about whether to terminate these New York brokers or not.  Dibb repeatedly expressed his concern that, if terminated for the Bank A-related conduct, NY Broker A and NY Broker B might disclose other misconduct, including the systemic use of TFS aliases to fly prices and print trades.

132.    On August 17, 2015, Dibb stated that the "problem" with firing NY Broker A and NY Broker B is that "we don't want disgruntled employees, we don't want whistleblowers." Dibb stated, "If I blow it open, the company's f[**]ked because they'll investigate everybody and every screen and everything we do."

133.    In a conversation with Dibb on or about September 30, 2015, NY Broker B threatened to blow the whistle on 1,000 trades printed via IM or over the phone.  Shortly thereafter, Dibb considered offering NY Trader B a no-show job in exchange for staying quiet.

134.    Neither NY Broker A nor NY Broker B was terminated at the end of their 60-day suspension.

135.    On or about November 3, 2015, NY Broker A and NY Broker B voluntarily resigned from their employment at TFS-ICAP.

136.    Dibb caused TFS-ICAP counsel to convey false information to the CFTC regarding how the Bank A conduct came to his attention.

137.    On at least one occasion, Dibb attempted to influence testimony given by a TFS-ICAP employee to Division staff.  In substance, Dibb told the employee to tell Division staff that flying and printing were not systemic and that it was "ok" to tell Division staff that you "don't recall."

<u>Dibb and Woolfenden Controlled, and Were Responsible For Supervising, TFS-ICAP Broker Conduct</u>

138.    Throughout the Relevant Period, Dibb and Woolfenden controlled, and were responsible for supervising, TFS-ICAP broker conduct.

139.     Woolfenden was the Global Head of Emerging Markets at TFS-ICAP—a position that at least gave him control and supervisory responsibility over all TFS-ICAP brokers on the Emerging Markets desks in New York and London, including NY Broker A, NY Broker B, and NY Broker C.

140.    He exercised this power when he wrested control of the LATAM desk from ICAP in 2007/2008 and taught the brokers on that desk how to fly prices and print trades.

141.    He continued to oversee and control the emerging markets business through at least 2015.

142.    Throughout the Relevant Period, Woolfenden controlled the bonus pool and had authority over hiring decisions.  The manager of the New York LATAM desk reported directly to him and sent him status reports on the business.

143.    Dibb was the CEO of TFS-ICAP from 2011 to at least 2017.  As the CEO, he controlled all brokers at TFS-ICAP and the day-to-day operations of the joint venture.

144.    Dibb was responsible for implementing company policies and procedures and ensuring that brokerage conduct was in compliance with the law.

145.    Dibb also exercised control over personnel decisions.

<u>Dibb and Woolfenden Failed to Supervise and To Detect and Deter Misconduct</u>

146.    Throughout the Relevant Period, Woolfenden and Dibb failed to deter or root out the practices of flying and printing, despite their ability to do so and despite their knowledge or constructive knowledge that such practices were ongoing.

147.    At no point during the Relevant Period was there a TFS-ICAP policy prohibiting

flying prices or printing trades.

148.    Woolfenden and Dibb together or individually could have directed that TFS-ICAP

brokers stop flying prices and printing trades.

149.    Dibb could have developed and caused the implementation of policies and

procedures that prohibited and deterred flying prices and printing trades.

150.    For example, Dibb could have directed Volbroker personnel to block all brokers

from using any TFS alias to fly prices.  Moreover, Dibb could have caused instant messages to

be monitored for false trade information conveyed to clients.

## V.  VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

**Violations of Section 4b(a)(2) of the Act,**
**7 U.S.C. § 6b(a)(2) (2012)**
**(Fraud in Connection with Swaps)**
**(TFS-ICAP, LLC, TFS-ICAP Ltd., Dibb, and Woolfenden)**

151.    The allegations set forth in paragraphs 1 to 150 are re-alleged and incorporated

herein by reference.

152.    Section 4b(a)(2) of the Act makes it unlawful "for any person, in or in connection

with any order to make, or the making of, any . . . swap, that is made, or to be made, for or on

behalf of, or with, any other person, other than on or subject to the rules of a designated contract

market—(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to

make or cause to be made to the other person any false report or statement or willfully to enter or

cause to be entered for the other person any false record; or (C) willfully to deceive or attempt to

deceive the other person by any means whatsoever in regard to any order or contract or the

26

disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or . . . with the other person."

153.     Under the Dodd-Frank Act revisions to the Commodity Exchange Act, FX options are classified as swaps,[7] and therefore subject to the prohibitions of Section 4b(a)(2) of the Act.

154.     As described above, beginning in at least 2008 and continuing to at least August 2015, brokers employed by TFS-ICAP, LLC communicated false information about swaps—specifically, false information about FX options prices and transactions—to market participants located in the United States and abroad.  Such information was material to market participants. The brokers knew or acted with reckless disregard that the information conveyed was false and they communicated it with the intent to deceive the market participants.  Since at least 2012, this conduct violated Section 4b(a)(2)(A)-(C) of the Act.

155.     As described above, from at least January 2014 through June 2014, brokers employed by TFS-ICAP Ltd. communicated false information about swaps—specifically, false information about FX options prices and transactions—to market participants located in the

---

[7]     In 1997, the Supreme Court construed Section 2(c)(1)(A) of the Act to exclude FX option contracts from CFTC jurisdiction.  *See Dunn v. CFTC*, 519 U.S. 465 (1997).  Under the Dodd-Frank Act revisions to the Commodity Exchange Act, however, FX options are classified as swaps, *see* 7 U.S.C. § 1a(47)(A)(i) (2012), over which the Act now expressly confers Commission jurisdiction, *see* 7 U.S.C. § 2(c)(2)(A)(ii) (2012).  A Department of Treasury determination and Commission Regulations clarify that, although certain foreign exchange derivatives have been excluded from the Act's jurisdiction pursuant to the Treasury exemption, foreign exchange options have not.  *See Determination of Foreign Exchange Swaps and Foreign Exchange Forwards Under the Commodity Exchange Act*, 77 Fed. Reg. 69,694, at 69,695 (Nov. 20, 2012) ("Foreign exchange options, currency swaps, and NDFs (as discussed below) may not be exempted from the CEA's definition of ''swap'' because they do not satisfy the statutory definitions of a foreign exchange swap or forward."); *see also* 17 C.F.R. § 1.3 (2018) ("swap": "For purposes of sections 1a(24) and 1a(25) of the Commodity Exchange Act and this definition, the following transactions are not foreign exchange forwards or foreign exchange swaps: … (B) a currency option, foreign currency option, foreign exchange option, or foreign exchange rate option [. . . .]").

United States and abroad.  Such information was material to market participants.   The brokers knew or acted with reckless disregard that the information conveyed was false and they communicated it with the intent to deceive market participants.  This conduct violated Section 4b(a)(2)(A)-(C) of the Act.

156.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), provides that "the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act of such individual, association, partnership, corporation, or trust."  Because the acts, omissions and failures of the employees of TFS-ICAP, LLC and TFS-ICAP Ltd. that violated Section 4b(a)(2) were within the scope of their employment, TFS-ICAP, LLC and TFS-ICAP Ltd. are liable for those acts constituting violations pursuant to Section 2(a)(1)(B).

157.    Throughout the Charging Period, Dibb and Woolfenden each controlled TFS-ICAP, LLC and TFS-ICAP Ltd. employees directly or indirectly and did not act in good faith or knowingly induced, directly or indirectly, the acts of TFS-ICAP, LLC and TFS-ICAP Ltd. employees that constitute the violations alleged in this count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), each aforementioned Defendant is liable as a controlling person for the violations by TFS-ICAP, LLC and TFS-ICAP Ltd. employees of Section 4b(a)(2).

158.    Section 13(a) of the Act provides that "any person who commits, or who willfully aids, abets, counsels, commands, induces or procures the commission of, a violation of any of the provisions of this Act . . . or who acts in combination or concert with any other person in any such violations . . . may be held responsible for such violation as a principal."  7 U.S.C. § 13c(a). Because Woolfenden encouraged and acted in concert with brokers in New York and London,

including NY Broker A and NY Broker B, to fly prices and print trades, and sought by his

actions to make such fraudulent conduct succeed, he is also liable for aiding and abetting the

brokers' violations of Section 4b(a)(2) pursuant to Section 13(a) of the Act.

### COUNT II

**Violations of Section 6(c)(1) of the Act,**
**7 U.S.C. § 9(1) (2012), and Regulation 180.1, 17 C.F.R. § 180.1(a) (2018)**
**(Use of Manipulative or Deceptive Devices)**
**(TFS-ICAP, LLC, TFS-ICAP Ltd., Dibb, and Woolfenden)**

159.    The allegations set forth in paragraphs 1 to 158 are re-alleged and incorporated

herein by reference.

160.    Section 6(c)(1) of the Act makes it unlawful "for any person, directly or

indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a

contract of sale of any commodity in interstate commerce, or for future delivery on or subject to

the rules of any registered entity, any manipulative or deceptive device or contrivance."

161.    Regulation 180.1(a) makes it "unlawful for any person, directly or indirectly, in

connection with any swap . . . to intentionally or recklessly:  (1) use or employ, or attempt to use

or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make,

any untrue or misleading statement of a material fact or to omit to state a material fact necessary

in order to make the statements made not untrue or misleading; [or] (3) engage, or attempt to

engage, in any act, practice, or course of business, which operates or would operate as a fraud or

deceit upon any person."

162.    Under the Dodd-Frank Act revisions to the Commodity Exchange Act, FX

options are classified as swaps, and therefore subject to the prohibitions of Section 6(c)(1) of the

Act and Regulation 180.1.

163.    As described above, beginning in at least 2008 and continuing to at least August 2015, brokers employed by TFS-ICAP, LLC communicated false information about FX options prices and FX options transactions to market participants located in the United States and abroad. Such information was material to those market participants.  The brokers knew or recklessly disregarded that the information conveyed was false and they communicated it with the intent to deceive market participants or with reckless disregard for the fact that it would deceive them. Since at least 2012, this conduct violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3).

164.    As described above, from at least January 2014 through June 2014, brokers employed by TFS-ICAP Ltd. communicated false information about FX options prices and FX options transactions to market participants located in the United States and abroad.  Such information was material to market participants.  The brokers knew or recklessly disregarded that the information conveyed was false and they communicated it with the intent to deceive market participants or with reckless disregard for the fact that it would deceive them.  This conduct violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3).

165.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), provides that "the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act of such individual, association, partnership, corporation, or trust."  Because the acts, omissions, and failures of the employees of TFS-ICAP, LLC and TFS-ICAP Ltd. that violated Section 6(c)(1) and Regulation 180.1 were within the scope of their employment, TFS-ICAP, LLC and TFS-ICAP Ltd. are liable for those acts constituting violations pursuant to Section 2(a)(1)(B).

166.    Dibb and Woolfenden each controlled TFS-ICAP, LLC and TFS-ICAP Ltd. employees directly or indirectly and did not act in good faith or knowingly induced, directly or indirectly, the acts of TFS-ICAP, LLC and TFS-ICAP Ltd. employees that constitute the violations alleged in this count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), each aforementioned Defendant is liable as a controlling person for the violations by TFS-ICAP, LLC and Ltd. employees of Section 6(c)(1) of the Act and Regulation 180.1.

167.    Throughout the Relevant Period, Woolfenden encouraged and acted in concert with brokers in New York and London, including NY Broker A and NY Broker B, to fly prices and print trades, and sought by his actions to make such deceptive conduct succeed. Accordingly, pursuant to Section 13(a) of the Act he is also liable for aiding and abetting the brokers' violations of Section 6(c)(1) of the Act and Regulation 180.1.

## COUNT III

**Violations of Section 4c(a)(1)-(2) of the Act,
7 U.S.C. §§ 6c(a)(1)–(2) (2012)
(Confirming Fictitious Sales and Transactions Used To Cause Reporting of Untrue and
Non-Bona Fide Prices)
(TFS-ICAP, LLC, TFS-ICAP Ltd., Dibb, and Woolfenden)**

168.    The allegations set forth in paragraphs 1 to 167 are re-alleged and incorporated herein by reference.

169.    Section 4c(a)(1) of the Act makes it "unlawful for any person to offer to enter into, enter into, or confirm the execution of a 'transaction' . . . involving the purchase or sale of any commodity for future delivery or . . . swap, if the transaction is used or may be used to (A) hedge any transaction in interstate commerce in the commodity or the product or byproduct of

the commodity; [or] (B) determine the price basis of any such transaction in interstate commerce in the commodity."

170.    Section 4c(a)(2) of the Act defines "transaction," as used in Section 4c(a)(1), to mean, among other things, "a transaction that— (A) . . . is a fictitious sale; or (B) is used to cause any price to be reported, registered, or recorded that is not a true and bona fide price."

171.    Under the Dodd-Frank Act revisions to the Commodity Exchange Act, FX options are classified as swaps, and therefore subject to the prohibitions of Section 4c(a) of the Act.

172.    As described above, beginning in at least 2008 and continuing to at least August 2015, brokers employed by TFS-ICAP, LLC entered into and confirmed, or caused the confirmation of, the execution of certain FX options transactions that were fictitious and were used to cause a price to be recorded on Volbroker and communicated to clients that was not a true and bona fide price.  This conduct violated Section 4c(a)(1)-(2) of the Act.

173.    As described above, from at least January 2014 through June 2014, brokers employed by TFS-ICAP Ltd. entered into and confirmed, or caused the confirmation of, the execution of certain FX options transactions that were fictitious and were used to cause a price to be recorded on Volbroker and communicated to U.S.-based clients that was not a true and bona fide price.  This conduct violated Section 4c(a)(1)-(2) of the Act.

174.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), provides that "the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act of such individual, association, partnership, corporation, or trust."  Because the acts, omissions and failures of the employees of TFS-ICAP, LLC and TFS-ICAP Ltd. that violated

Section 4c(a)(1)-(2) were within the scope of their employment, TFS-ICAP, LLC and TFS-ICAP Ltd. are liable for those acts constituting violations pursuant to Section 2(a)(1)(B).

175.   Dibb and Woolfenden each controlled TFS-ICAP, LLC and TFS-ICAP Ltd. employees directly or indirectly and did not act in good faith or knowingly induced, directly or indirectly, the acts of TFS-ICAP, LLC and TFS-ICAP Ltd. employees that constitute the violations alleged in this count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), each aforementioned Defendant is liable as a controlling person for the violations by TFS-ICAP, LLC and Ltd. employees of 4c(a)(1)-(2) of the Act.

176.   Throughout the Relevant Period, Woolfenden encouraged and acted in concert with brokers in New York and London, including NY Broker A and NY Broker B, to confirm, or cause the confirmation of, the execution of certain FX options transactions that were fictitious and were used to cause a price to be recorded on Volbroker and communicated to U.S.-based clients that was not a true and bona fide price.  Accordingly, pursuant to Section 13(a) of the Act Woolfenden is also liable for aiding and abetting the brokers' violations of Section 4c(a)(1)-(2) of the Act.

## COUNT IV

**Violation of Regulation 166.3, 17 C.F.R. § 166.3 (2018)**
**(Failure to Diligently Supervise)**
**(TFS-ICAP, LLC, TFS-ICAP Ltd., Dibb, and Woolfenden)**

177.   The allegations set forth in paragraphs 1 to 176 are re-alleged and incorporated herein by reference.

178.   Pursuant to Regulation 166.3, "each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents . . . of all commodity interest accounts carried, operated, advised

or introduced by the registrant and all other activities of its partners, officers, employees and agents . . . relating to its business as a Commission registrant."

179.     From at least 2012 to 2015, TFS-ICAP, LLC was or should have been registered with the Commission as an Introducing Broker.  Throughout this period, its employees were engaged in the solicitation or acceptance of orders for the purchase and sale of swaps.

180.     From at least January 2014 to June 2014, TFS-ICAP Ltd. should have been registered with the Commission as an Introducing Broker.  Throughout this period, its employees were engaged in the solicitation or acceptance of orders for the purchase and sale of swaps for U.S.-based clients.

181.     From at least 2012 to 2015, Dibb and Woolfenden were, or should have been, registered with the Commission as associated persons of TFS-ICAP, LLC.  From at least January 2014 to June 2014, Dibb and Woolfenden were, or should have been, registered with the Commission as associated persons of TFS-ICAP Ltd.

182.     Throughout the Charging Period, Dibb and Woolfenden had supervisory responsibilities relating to TFS-ICAP, LLC and TFS-ICAP Ltd. employees, who were engaged in the solicitation or acceptance of orders for the purchase and sale of swaps.

183.     As discussed above, during the Charging Period, Dibb and Woolfenden knew or had reason to know that brokers at TFS-ICAP were flying prices and printing trades to customers based in the U.S. and abroad.  Despite this knowledge, they failed to diligently perform their supervisory duties or implement any policies or procedures to ensure that brokers did not engage in this conduct.  As discussed above, rather than take steps to root out misconduct, Dibb tried to cover up or limit the extent of disclosure to regulators and the public.  These failures violated Regulation 166.3.

184.     As discussed above, during the Charging Period, TFS-ICAP, LLC, through its

senior managerial officials, knew or had reason to know that employees of TFS-ICAP, LLC were

flying prices and printing trades to customers based in the U.S. and abroad.  Despite this

knowledge, TFS-ICAP, LLC failed to implement any policies or procedures to ensure that

brokers did not engage in this conduct.  This failure violated Regulation 166.3.

185.     As discussed above, from at least January 2014 to June 2014, TFS-ICAP Ltd.,

through its senior managerial officials, knew or had reason to know that employees of TFS-ICAP

Ltd. were flying prices and printing trades to customers based in the U.S. and abroad.  Despite

this knowledge, TFS-ICAP Ltd. failed to implement any policies or procedures to ensure that

brokers did not engage in this conduct.  This failure violated Regulation 166.3.


## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by

Section 6c of the Act, as amended, 7 U.S.C. §13a-1 (2012), and pursuant to its own equitable

powers:

A.     Enter an order finding Defendants TFS-ICAP, LLC, TFS-ICAP Ltd., Dibb, and

Woolfenden liable for violating Sections 4b(a)(2), 6(c)(1), and 4c(a)(1)-(2) of the Act, 7 U.S.C.

§§ 6b(a)(2), 9(1), 6c(a)(1)-(2) (2012), and Regulations 180.1 and 166.3, 17 C.F.R. §§ 180.1,

166.3 (2018);

B.     Enter orders of a preliminary and permanent injunction restraining and enjoining

Defendants, and any of their affiliates, agents, servants, employees, successors, assigns,

attorneys, and persons in active concert with them who receive actual notice of such order by

personal service or otherwise, from:

i. Directly or indirectly violating Sections 4b(a)(2), 6(c)(1), and 4c(a)(1)-(2) of the Act and Regulations 180.1 and 166.3; and

ii. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission;

C. Enter orders requiring Defendants to pay civil monetary penalties of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2018), for each violation of the Act or Regulations as described herein, plus post-judgment interest;

D. Enter an order requiring Defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received, including, but not limited to, salaries, bonuses, commissions, loans, fees, revenues, and profits derived, directly or indirectly, from acts or practices that constitute violations of the Act and Regulations as described herein, including pre- and post-judgment interest thereon from the date of such violations;

E. Enter an order requiring Defendants to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

F. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

36

## VI. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 28, 2018

Respectfully submitted,

COMMODITY FUTURES
TRADING COMMISSION

Manal M. Sultan
Deputy Director

By:   /s/ Samuel Wasserman_____
      Samuel Wasserman
      K. Brent Tomer

Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
Phone: (646) 746-9700
Fax: (646) 746-9939