USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/20/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

- against -

TFS-ICAP, LLC, et al.,

Defendants.

---

18 Civ. 8914 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Commodity Futures Trading Commission ("CFTC" or the "Commission") brings this action against defendants TFS-ICAP, LLC, TFS-ICAP Ltd. (together with TFS-ICAP, LLC, "TFS-ICAP" or the "Corporate Defendants"), Ian Dibb ("Dibb"), and Jeremy Woolfenden ("Woolfenden," and together with Dibb, the "Individual Defendants") (collectively, "Defendants"). The complaint alleges violations of the Commodity Exchange Act (the "Act") and associated Commission regulations. (See "Complaint," Dkt. No. 5, ¶¶ 151-85.)

Before the Court are the pre-motion letters submitted by Woolfenden seeking leave to file a motion to dismiss the Complaint. The Court construes such letters as a motion by Woolfenden to dismiss the Complaint[1] pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure ("Rule 12(b)(2)")

[1] Kapitalforeningen Lægernes Invest v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (Mem.) (affirming district court ruling deeming exchange of letters as motion to dismiss).

(the "Woolfenden Motion"). For the reasons set forth below, the Woolfenden Motion is DENIED.

## I. BACKGROUND[2]

TFS-ICAP, LLC is a United States entity and TFS-ICAP Ltd. is a United Kingdom entity. The entities have been registered with the CFTC as introducing brokers since January 2013 and November 2015, respectively. The CFTC alleges that, from at least 2008 to 2015 (the "Relevant Period"), brokers at TFS-ICAP offices in the United States and the United Kingdom deceived their clients by "flying prices/rates" and "printing/calling trades" -- that is, the brokers communicated to their clients fake bids and offers and fake trades in the foreign exchange ("FX") options market. TFS-ICAP brokers flew prices and printed trades by phone, instant message, and on Volbroker (TFS-ICAP's proprietary electronic trading platform).

The CFTC further alleges that the practices of "flying prices" and "printing trades" were a core part of TFS-ICAP's broking business. According to the CFTC, the intent behind flying prices and printing trades was "to give clients the

---

[2] Except as otherwise noted, the factual background below derives from the Complaint and the facts there pleaded, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See infra Part II. Except where specifically quoted, no further citation will be made to the Complaint.

impression that there was more liquidity on TFS-ICAP's platform than there actually was and to induce traders to transact at times and prices that they would not otherwise have transacted." (Id. ¶ 51.) From at least 2012 through August 2015 (the "Charging Period"), these practices constituted violations of Sections 4b(a)(2), 6(c)(1), and 4c(a)(1)-(2) of the Act, 7 U.S.C. §§ 6b(a)(2), 9(1), 6c(a)(1)-(2) (2012) ("Section 4b(a)(2)," "Section 6(c)(1)," and "Section 4c(a)(1)-(2)," respectively), and Commission Regulation 180.1, 17 C.F.R. § 180.1 (2018) ("Regulation 180.1"). The Complaint further contends that TFS-ICAP is liable for those violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012) ("Section 2(a)(1)(B)"), because the brokers engaged in the fraudulent conduct within the scope of their employment.

The Complaint also alleges violations of the Act and its associated regulations by the Individual Defendants. Dibb became the CEO of TFS-ICAP in 2011, and Woolfenden was the Global Head of Emerging Markets of TFS-ICAP during the relevant times. According to the CFTC, Dibb and Woolfenden engaged in the underlying violations as well as supervisory failures due to their alleged knowledge and/or encouragement of the deceptive practices described above. The Complaint

therefore contends that Dibb and Woolfenden are liable for all of the underlying violations pursuant to Sections 13(a) and 13(b) of the Act, 7 U.S.C. §§ 13c(a), 13c(b) (2012) ("Section 13(a)" and "Section 13(b)," respectively), as well as their failure to supervise pursuant to Commission Regulation 166.3, 17 C.F.R. § 166.3 (2018) ("Regulation 166.3").

The CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012) ("Section 6c"), to enjoin Defendants' prohibited acts and practices and to compel Defendants' compliance with the Act. The CFTC also seeks civil monetary penalties and such other equitable relief, including but not limited to disgorgement, as the Court deems necessary and appropriate.

Consistent with the Court's Individual Practices, on February 11, 2019, counsel for Woolfenden wrote to the CFTC regarding an anticipated motion to dismiss the Complaint.[3] ("February 11 Letter," Dkt. No. 38.) Woolfenden argues that the Complaint against him should be dismissed for four reasons. Woolfenden's first and primary argument for

[3] The Court has also received pre-motion letter exchanges from the Corporate Defendants and Dibb. Each of those letter exchanges also contemplates a motion to dismiss the Complaint. For the reasons set forth infra Section III.C, the Court in this Order addresses only the letter exchange between Woolfenden and the CFTC.

dismissal is that the Court lacks personal jurisdiction over Woolfenden, and the Complaint should therefore be dismissed pursuant to Rule 12(b)(2). Woolfenden, a United Kingdom citizen who resides in that country, argues that the Court lacks general jurisdiction over him because "the paradigm forum for the exercise of general jurisdiction is the individual's domicile," which for Woolfenden is the United Kingdom. (Id. at 1 (quoting Daimler AG v. Bauman, 571 U.S. 117, 137 (2014)).) Woolfenden contends that the Court lacks specific jurisdiction because none of Woolfenden's alleged contacts with the forum state or the entire United States satisfy the test for specific jurisdiction. He argues that his alleged contacts with the forum all occurred prior to the alleged misconduct and/or were not created by Woolfenden himself. (See id. at 1-2.) He also argues that the exercise of personal jurisdiction in this case would not comport with the traditional notions of fair play and substantial justice because "Woolfenden has lived and worked in the U.K. during the entire charged period" and "[his] exclusion from the case would in no way prevent [the CFTC] from pursuing its case against TFS-ICAP." (Id. at 3.)

Although Woolfenden centers his argument in favor of dismissal on personal jurisdiction, he presents three

additional reasons why, in his view, the Complaint warrants dismissal. First, Woolfenden argues that the allegations prior to September 2013 are time-barred because under 28 U.S.C. Section 2462, plaintiffs must file suit within five years from the date when their claim first accrues. Second, Woolfenden argues that the allegations dating to after September 2013 fail to satisfy the standards of Rule 8(a) or the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)" and "Rule 8(a)," respectively). Third, Woolfenden posits -- without citing any authority -- that the practice of "flying prices" does not violate the Act because (a) "flying is not a material misrepresentation as required" under the statutory and regulatory provisions at issue, (b) "[flying] does not meet the definition of 'transaction' under Section 4c(a)(2)," and (c) "there has been no fair notice that alleged 'flying' violates any U.S. laws." (Id.)

By letter dated February 22, 2019, the CFTC responded to Woolfenden's February 11 Letter, arguing that the Complaint against him would survive a motion to dismiss. ("February 22 Letter," Dkt. No. 40.) The CFTC argues that the Court has personal jurisdiction over Woolfenden because "his actions caused the underlying misconduct at issue in this case." (Id.

at 1.) According to the CFTC, Woolfenden trained and encouraged TFS-ICAP brokers to make misrepresentations to clients based in the United States; Woolfenden, from TFS-ICAP offices in London, through at least mid-August 2015, directly supervised and managed TFS-ICAP brokers located in the United States; and Woolfenden registered with the CFTC in the United States. The CFTC notes that "[t]he minimum contacts test is satisfied 'where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there.'" (Id. at 2 (quoting Cohen v. BMW Investments L.P., 144 F. Supp. 3d 492, 499 (S.D.N.Y. 2015)).) In light of that test, the CFTC posits that the allegations in the Complaint sufficiently establish the Court's personal jurisdiction over Woolfenden.

The CFTC also responds to Woolfenden's other arguments. First, the CFTC argues that the allegations relating to conduct prior to September 2013 are permissibly included in the Complaint, because "allegations dated outside the statute of limitations are permitted to support a claim arising from allegations within the limitations period." (Id. at 3 n.4.) Second, the CFTC disputes Woolfenden's characterization of the level of specificity included in the Complaint, arguing that its allegations satisfy the pleading standards of Rule

9(b) and Rule 8(a). Third, the CFTC disputes Woolfenden's argument regarding whether the practice of "flying prices" violates the Act. The CFTC instead contends that "the Complaint adequately alleges that the conduct at issue was 'material' to traders, the definition of 'transaction' under the Act is sufficiently broad, and the statutes and regulations at issue plainly make deceptive practices -- like 'flying,' as alleged -- illegal and thus provide fair notice." (Id. at 3 (citations omitted).)

By letter to the Court dated March 15, 2019, the CFTC requested that the Court set a deadline for the Individual Defendants to respond to the Complaint because "neither defendant has notified the court in writing of his intention to proceed with . . . a motion [to dismiss]." ("March 15 Letter," Dkt. No. 41, at 1.)

Woolfenden, by letter dated March 21, 2019, responded to the CFTC's March 15 Letter, asking the Court to grant his request for leave to file a motion to dismiss. ("March 21 Letter," Dkt. No. 43.) In addition, Woolfenden replied to the CFTC's arguments regarding personal jurisdiction, reiterating his position that the Court lacks personal jurisdiction over him. Woolfenden argues that "[t]he CFTC's reliance on the fact that the contacts must be with 'the United States, not

just New York,' does not help, because its allegations do not establish a 'substantial connection' created by the 'defendant himself' with the United States." (Id. at 1 (citations omitted).) Woolfenden also contends that the allegations in the Complaint regarding Woolfenden "encourage[ing]" New York brokers to "fly prices" and "print trades" are vague and conclusory, and thus insufficient to establish that Woolfenden directed his conduct at the United States. (Id.) Woolfenden further argues that the Complaint fails to allege that Woolfenden was "a 'primary actor' of the transactions in New York at issue" and that that "occasional electronic communications with persons in the forum state" -- such as those alleged in the Complaint -- fail to establish personal jurisdiction. (Id. at 1-2.) Similarly, Woolfenden argues that the allegations in the Complaint regarding his presence at and participation in conversations during which there were discussions of "flying prices" and "printing trades" are "far too vague" to establish personal jurisdiction. (Id. at 3.) Finally, Woolfenden argues that "[f]orcing [him] to litigate across the Atlantic would be unduly burdensome and would abridge principles of comity," thus warranting dismissal of the Complaint against him. (Id.)

On April 5, 2019, the Court held a telephone conference with counsel for the CFTC and counsel for Woolfenden (the "April 5 Telephone Conference"). (See Dkt. Minute Entry for 4/5/2019.) During the April 5 Telephone Conference, the Court heard arguments from the parties and made certain preliminary findings. The Court advised the parties of its view that the Complaint appears to contain sufficiently particular factual allegations supporting the CFTC's legal claims to survive a motion to dismiss pursuant to Rule 12(b)(6), but it directed the parties to submit additional letters regarding the issue of personal jurisdiction. The Court set a schedule for an exchange of additional letters regarding the issue of personal jurisdiction. Finally, the Court suggested that it would deem Woolfenden's February 11 Letter and the March 21 Letter as a motion to dismiss.[4]

Pursuant to the Court's directive, Woolfenden submitted a supplemental letter outlining five reasons why he believes the Complaint against him should be dismissed for lack of personal jurisdiction. ("April 9 Letter," Dkt. No. 44.)

---

[4] While Woolfenden, in his February 11 Letter, advanced several reasons for dismissal of the Complaint pursuant to Rule 12(b)(6), the Court, during the April 5 Telephone Conference, indicated its preliminary view that the Complaint alleges sufficient facts to survive a Rule 12(b)(6) motion to dismiss. Accordingly, this Order addresses only Woolfenden's motion to dismiss the Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2).

First, Woolfenden argues that the CFTC is not entitled to jurisdictional discovery because it has failed to establish a prima facie case of personal jurisdiction. Second, Woolfenden opposes the CFTC's argument that the totality of his contacts with the forum must be evaluated; instead, Woolfenden argues that because each allegation is insufficient on its own, the allegations are cumulatively insufficient, as well. Third, Woolfenden contends that the Court should not consider his pre-2013 conduct -- that is, the conduct predating the relevant statutory period -- in evaluating personal jurisdiction. Fourth, Woolfenden posits that the five allegations in the Complaint which the CFTC referenced during the April 5 Telephone Conference are insufficient, individually and collectively, to establish personal jurisdiction because those allegations predate the relevant statutory period, lack support in the case law, and/or are too general to satisfy the CFTC's burden. Finally, Woolfenden argues that the Act does not apply extraterritorially.

By letter dated April 19, 2019, the CFTC responded to Woolfenden's April 9 Letter, arguing in further support of its position that the Court has personal jurisdiction over Woolfenden. ("April 19 Letter," Dkt. No. 45.) The CFTC also

submitted the declaration of Christopher Giglio, a Senior Futures Investigator in the Division of Enforcement at the Commission, which in turn attached twelve exhibits purportedly establishing Woolfenden's contacts with the United States as well as New York. (See "Giglio Decl.," Dkt. No. 53.) In its April 19 Letter and supporting materials, the CFTC presents several reasons for why it believes the Court has personal jurisdiction over Woolfenden. The CFTC contends that Woolfenden supervised and controlled TFS-ICAP brokers who conducted business in the United States and business directed towards New York-based clients in 2014 and 2015 (i.e., during the Charging Period). The CFTC also points to a business trip that Woolfenden took to New York in March 2014; Woolfenden's supervision of and communication with New York-based TFS-ICAP brokers; and Woolfenden's management of a joint effort by the New York and London-based brokers in 2014 and 2015. The CFTC further argues that there is a clear nexus between Woolfenden's contacts with the United States and the CFTC's allegations in this action. Specifically, the CFTC contends that Woolfenden is liable for TFS-ICAP's violations of the Act because he supervised and had control over -- and also aided and abetted -- the illegal conduct of TFS-ICAP brokers. In light of these factual allegations, the

CFTC contends that Woolfenden availed himself of the forum, and the Court should therefore exercise personal jurisdiction over him.

By letter dated May 6, 2019, Woolfenden responded to the CFTC's April 19 Letter. ("May 6 Letter," Dkt. No. 48.) Woolfenden also submitted his own sworn declaration, which included one exhibit and was filed under seal. (See "Woolfenden Declaration," Dkt. No. 49.) At the outset of his May 6 Letter, Woolfenden contends that the Court should not consider the twelve attachments to the Giglio Declaration, because to do so would "improperly treat[] . . . Woolfenden's facial challenge to personal jurisdiction as a factual challenge." (Id. at 1 (emphasis omitted).) Woolfenden proceeds to argue that even if the Court considers the twelve documents attached to the Giglio Declaration, the Court lacks personal jurisdiction over Woolfenden for four reasons. First, Woolfenden had few contacts with the United States, and his limited contacts with the forum were insufficient to establish a "substantial connection" therewith. Second, the CFTC has failed to establish that its injuries were proximately caused by Woolfenden's contacts with the United States. Third, the CFTC's reading of the documents attached to the Giglio Declaration is at odds with the plain meaning

of those documents -- and the CFTC has thus failed to muster evidence in support of a finding of personal jurisdiction over Woolfenden. And finally, Woolfenden argues that the exercise of personal jurisdiction over him would be unfair.[5]

Given this detailed and extensive letter exchange, as well as the Court's instructions during the April 5 Telephone Conference, the Court now construes the February 11 Letter, March 21 Letter, April 9 Letter, and May 6 Letter, along with the attached Woolfenden Declaration, from Woolfenden as a motion to dismiss the Complaint pursuant to Rule 12(b)(2) for lack of personal jurisdiction.

## II. LEGAL STANDARDS

Upon motion, the Court must dismiss an action against any defendant over whom it lacks personal jurisdiction. See Fed. R. Civ. P. 12(b)(2). To prevail on such a motion, the plaintiff "bears the burden of showing that the court has jurisdiction over the defendant." In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (per

[5] The Court notes that the U.K. Financial Conduct Authority ("FCA") has also investigated the events outlined in the complaint but finds that this fact has no bearing on the proceedings before it. Woolfenden argues that forcing him to litigate in New York would be "simply unfair" given the FCA's decision to close its investigation into his alleged misleading statements or practices. (See May 6 Letter at 1.) But Woolfenden also argues that since the FCA is still investigating whether his conduct "makes him unfit to work in the U.K. industry," the court should refrain from exercising jurisdiction under principles of comity. (Id.; id. at 10.) The Court sees no reason why the parallel FCA proceeding should have any impact on the CFTC's investigation.

curiam); accord DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001); Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). Where, as here, a court does not conduct an evidentiary hearing on the issue of personal jurisdiction, "the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." DiStefano, 286 F.3d at 84 (citing Bank Brussels Lambert, 171 F.3d at 784). To make this showing, a plaintiff may demonstrate "through its own affidavits and supporting materials, containing a good faith averment of facts that, if credited . . . , would suffice to establish jurisdiction over the defendant." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 399 F. Supp. 2d 325, 330 (S.D.N.Y. 2005) (alterations omitted) (quoting Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001)). When evaluating a motion to dismiss for lack of personal jurisdiction, courts "may consider materials outside the pleadings, including affidavits and other written materials." Jonas v. Estate of Leven, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015).

In deciding whether the plaintiff has met this burden, the pleadings and affidavits must be viewed in the light most favorable to the plaintiff, with all doubts resolved in its

favor. See, e.g., DiStefano, 286 F.3d at 84; Whitaker, 261 F.3d at 208. "However, conclusory allegations are not enough to establish personal jurisdiction." Gmurzynska v. Hutton, 257 F. Supp. 2d 621, 625 (S.D.N.Y. 2003) (internal quotation marks omitted), aff'd, 355 F.3d 206 (2d Cir. 2004); accord Yellow Page Sols., Inc. v. Bell Atl. Yellow Pages Co., No. 00 Civ. 5663, 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) ("The plaintiff cannot rely merely on conclusory statements or allegations; rather, the prima facie showing must be factually supported." (internal citations and quotation marks omitted)).

## III. DISCUSSION

### A. THE CFTC'S EXHIBITS

The Court first addresses the parties' dispute regarding the record that the Court should consider when deciding the Woolfenden Motion. Woolfenden challenges the CFTC's reliance on the twelve documents submitted with its supplemental April 19 Letter, arguing that it would be improper for the Court to consider those documents at this stage of the proceedings. The Court disagrees.

It is well-settled law that "[i]n deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway." Dorchester Fin.

Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013) (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)). Given this leeway, the court "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." Id. (quoting Marine Midland Bank, N.A., 664 F.2d at 84); accord In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 399 F. Supp. 2d at 330. Therefore, the Court is satisfied that it "may consider materials outside the pleadings," including the Giglio Declaration and its attached exhibits. Jonas, 116 F. Supp. 3d at 323.

B. PERSONAL JURISDICTION OVER WOOLFENDEN

The Court now turns to the question of whether the CFTC has made a prima facie showing that the Court has personal jurisdiction over Woolfenden.

1. Personal Jurisdiction Test

The CFTC does not argue that Woolfenden is at home in the United States such that the Court's exercise of general jurisdiction would be appropriate. See Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011). It argues instead that this Court has specific jurisdiction over Woolfenden. To establish specific jurisdiction over

Woolfenden, the CFTC must allege that he had "certain minimum contacts with the relevant forum." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks omitted).[6]

The first question is what constitutes the "relevant forum." Under the circumstances presented, the Court finds that the relevant forum here is the United States. "When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." S.E.C. v. Straub, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (internal quotations omitted). Thus, the CFTC must establish that Woolfenden had minimum contacts with the United States.

Apart from considering contacts with the entire United States, the minimum contacts test is otherwise the same as it is in diversity cases because the language of the Fifth Amendment's due process clause is identical to that of the

[6] As a preliminary matter, the plaintiff must properly deliver service of process upon the defendant. Woolfenden does not dispute that service of process was properly delivered to him, and, in any event, the Court is satisfied in that regard. (See "Certificate of Service," Dkt. No. 35.)

Fourteenth Amendment. Waldman v. Palestine Liberation Org., 835 F.3d 317, 330-31 (2d Cir. 2016); Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998). The guiding principle of this test is whether "the suit arises out of or relates to the defendant's contacts with the forum." Straub, 921 F. Supp. 2d at 253 (internal quotation marks and alterations omitted). If so, the Court may exercise jurisdiction. Here, the CFTC can meet this test by establishing that Woolfenden "purposefully availed himself of the privilege of doing business in the [United States] and . . . could foresee being haled into court there." Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 242-43 (2d Cir. 1999) (internal quotation marks and alterations omitted). "Although a defendant may not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum." Straub, 921 F. Supp. 2d at 253-54 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (internal quotations, alteration, and emphasis omitted)).

The last requirement for exercising jurisdiction is that "the exercise of jurisdiction [be] reasonable in the circumstances." In re Terrorist Attacks, 714 F.3d at 673. In

assessing reasonableness, courts "determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King, 471 U.S. at 476 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)). "The reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved." S.E.C. v. Syndicated Food Servs. Int'l, Inc., No. 04 Civ. 1303, 2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010) (internal quotation marks omitted). Nevertheless, the requirement continues to serve a purpose as a "constitutional floor to protect litigants from truly undue burdens." Id. (internal quotation marks omitted). In particular, where a defendant is not located in the United States, courts should exercise "great care and reserve . . . when extending our notions of personal jurisdiction into the international context." S.E.C. v. Sharef, 924 F. Supp. 2d 539, 548 (S.D.N.Y. 2013) (internal quotation marks and alteration omitted).

2. Application of the Minimum Contacts Test

The CFTC's allegations against Woolfenden sufficiently establish a prima facie showing that specific jurisdiction is warranted. The CFTC alleges that Woolfenden supervised,

controlled, and communicated with TFS-ICAP brokers in the United States and the United Kingdom who "flew prices" and "printed trades" in the course of business directed towards TFS-ICAP New York-based clients. Based on his alleged role as described in the Complaint and the record, the Court is persuaded that Woolfenden's dealings rise to the level of minimum contacts with the forum in the United States and support the Court's exercise of personal jurisdiction over him.

a. Pre-2013 Allegations

The first set of allegations in the Complaint requires the Court to determine whether Woolfenden's pre-2013 contacts with the United States may be considered for the purpose of establishing personal jurisdiction for claims arising post-2013. The Complaint alleges that Woolfenden traveled to New Jersey in 2007 to evaluate TFS-ICAP's LATAM business, the majority of which consisted of U.S. Dollar/Mexican Peso and U.S. Dollar/Brazilian Real currency pairs. Based on his trip, Woolfenden allegedly concluded that brokers at the LATAM desk were not flying enough prices. He circulated a memo (quoted in the Complaint) indicating that he was asking brokers at the LATAM desk to fly prices and stating that, if they did not, management of the desk would be turned over to another

segment of the business. The Complaint further alleges that Woolfenden did indeed replace the two LATAM desk co-managers who were reluctant to fly prices with another employee who was willing to do so. This broker acted as desk manager for the LATAM desk from 2008 until early 2014 and reported to Woolfenden throughout that time. From 2008 to 2015, that broker and another broker "frequently flew prices and printed fake trades to clients as they had been encouraged to do so by Woolfenden." (Compl. ¶ 78.)

TFS-ICAP argues that these allegations are irrelevant to the personal jurisdiction analysis and that it would be unjust for the Court to consider them. The Court disagrees. While there is scant case law on this issue, the courts that have considered the question have held that the analysis hinges on whether the plaintiff is asking the Court to assert specific or general jurisdiction over the defendant. In diversity cases applying New York's long-arm statute, C.P.L.R. § 302(a), this Court has found that, for the purposes of the Fourteenth Amendment due process analysis, the "time period is irrelevant; so long as defendants transacted business in New York, and plaintiff's claims arise out of that activity, personal jurisdiction is proper." Afloat in France, Inc. v. Bancroft Cruises Ltd., No. 03 Civ. 917, 2003 WL 22400213, at

*5 n.8 (S.D.N.Y. Oct. 21, 2003); see also Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1224 (3d Cir. 1992) ("[W]e must take into account the defendants' contacts with the Commonwealth before, during, and after the dates the loans were made and the guaranties were executed." (emphasis omitted)); Steel v. United States, 813 F.2d 1545, 1549-50 (9th Cir. 1987) ("[T]he fair warning given by [defendant] by his contacts with California does not expire simply because of his lack of later contacts with the state."); Praetorian Specialty Ins. Co. v. Auguillard Constr. Co., Inc., 829 F. Supp. 2d 456, 468 (W.D. La. 2010) (noting the lack of case law on the issue). In general jurisdiction cases, on the other hand, where the defendant's contacts are generally more extensive, the need arises for some sort of limiting time period. The Second Circuit has approved of a six-year lookback period before the complaint was filed, and the Supreme Court has approved of a seven-year lookback period. See Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 569 (2d Cir. 1996); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 409-11 (1984); see also In re Terrorist Attacks on Sept. 11, 2001, 440 F. Supp. 2d 281, 285 (S.D.N.Y. 2006).

As noted, this case concerns specific jurisdiction, even though -- because it also entails a federal question --

C.P.L.R. § 302(a) does not apply. It follows that there is no set time period for which Woolfenden's contacts with the forum can be used to support the Court's exercise of personal jurisdiction over him. Instead, the guiding principle is whether the suit "relates to the defendant's contacts with the forum." Straub, 921 F. Supp. 2d at 253 (quoting Helicopteros, 466 U.S. at 414 n.8) (internal quotation marks and alteration omitted). If so, the Court may consider those contacts for the purpose of determining whether it has jurisdiction over the defendant, even if some of the contacts with the forum pre-date the conduct that forms the basis of the cause of action.[7] Thus, the question here is whether the CFTC's case arises out of, or relates to, Woolfenden's pre-2013 conduct as alleged in the Complaint.

At this preliminary stage in the litigation, the Court finds that the pre-2013 contacts are sufficiently related to

---

[7] Of course, there are limits on how far back in time the Court may assess contacts giving rise to personal jurisdiction even in specific jurisdiction cases. Some limits will implicate due process, whether the case falls under the Fifth Amendment or the Fourteenth Amendment. At a certain point remote in time a defendant will cease to have fair warning that his contacts with the forum could support personal jurisdiction. This case does not present such concerns because the earliest allegations date to 2007, just six years before the statutory conduct period. Other limits stem from more practical considerations: the contacts may so pre-date the conduct at issue that they do not relate to the suit. See Molex Co., LLC v. Andress, 887 F. Supp. 2d 1189, 1202 (N.D. Ala. 2012) (proper temporal scope of minimum contacts analysis under the Fourteenth Amendment deemed to be all contacts "related to the claims asserted in this action" (emphasis omitted)).

the CFTC's allegations. The Complaint alleges that Woolfenden visited the United States, diagnosed a problem relating to TFS-ICAP brokers flying prices, and took direct action to fix it, which caused the alleged flying and printing at issue here during the statutory period. It does not matter, for the purposes of determining minimum contacts, whether his conduct was lawful at the time or even whether flying and printing trades was lawful at the time. Woolfenden cites no case to the contrary. What matters are Woolfenden's contacts themselves, and whether the CFTC suit relates to them. Because the CFTC alleges that Woolfenden's trip to the United States and the actions he took following his trip caused the flying and printing that took place during the statutory conduct period, the Court finds that it may consider these Woolfenden contacts with the United States for the purposes of determining exercise of personal jurisdiction over him.

b. <u>2013 and Post-2013 Allegations</u>

Turning to Woolfenden's contacts with the United States dating from 2013 and later, the Court is satisfied that these contacts, when viewed in conjunction with the pre-2013 contacts described above, support the Court's exercise of personal jurisdiction over Woolfenden.

The Complaint alleges that Woolfenden maintained some level of supervisory control over brokers in the United States and failed to supervise diligently, in violation of Regulation 166.3. Even in non-CFTC cases, supervisory control over an employee may be grounds for permitting the exercise of jurisdiction over the supervisor.[8] E.g., Charles Schwab Corp. v. Bank of America Corp., 883 F.3d 68, 85 (2d Cir. 2018) (citing Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1330 (2d Cir. 1972), abrogated by Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010)).

Here, the allegations of supervision and control are robust, particularly when viewed in conjunction with the CFTC's exhibits. For example, the CFTC alleges that Woolfenden supervised the emerging markets brokers in the United States through at least 2015. The manager of the New

[8] The Court notes that the cases cited by Woolfenden on the issue of supervision and control are inapposite insofar as they interpret the subsection of New York's long-arm statute that provides for jurisdiction over a person who transacts business in the state. (April 9 Letter at 3, May 6 Letter at 5 (citing Karabu Corp. v. Gitner, 16 F. Supp. 2d 319, 323-24 (S.D.N.Y. 1998); Vista Food Exchange, Inc. v. Champion Foodservice, LLC, 124 F. Supp. 3d 301, 308 (S.D.N.Y. 2015)).) The New York long-arm statute is not entirely coextensive with the due process inquiry. Eades v. Kennedy, PC Law Offices, 799 F.3d 161, 168 (2d Cir. 2015) (N.Y.C.P.L.R. § 302(a) broader than federal due process); Best Van Lines, Inc. v. Walker, 490 F.3d 239, 245 (2d Cir. 2007) (N.Y.C.P.L.R. § 302(a) narrower than federal due process). Furthermore, the cases cited by Woolfenden are distinguishable; in Karabu, the complaint was "completely devoid of any factual specificity" indicating how the individual defendants had participated in the alleged scheme, 16 F. Supp. 2d at 325, and in Vista Food Exchange, the two individual defendants played only minor roles in the scheme by, e.g., mailing allegedly fraudulent invoices, 124 F. Supp. 3d at 308-09.

York LATAM desk reported directly to Woolfenden and sent him status reports on the business. Woolfenden hired and managed U.S.-based brokers, including by controlling the bonus pool and exercising authority over hiring decisions. These allegations are not, as Woolfenden contends, general statements about his title and position in the organization, but rather indicate that he played a key role in supervising the conduct at issue. (See March 21 Letter at 2.) In contrast, the complaints in the cases cited by Woolfenden included only vague and unsupported allegations of a defendant's control, rendering those cases distinguishable. See Pilates, Inc. v. Current Concepts, No. 96-cv-43, 1996 WL 599654, at *3 (S.D.N.Y. Oct. 18, 1996); Ontel Prods., Inc. v. Project Strategies Corp., 899 F. Supp. 1144, 1148 (S.D.N.Y. 1995).

The CFTC's exhibits provide additional support for the allegations in the Complaint that Woolfenden exercised supervisory control over employees in the United States. The exhibits demonstrate Woolfenden's role managing the LATAM desk, which was located in the United States. Exhibits A through C show Woolfenden working through staffing issues with the LATAM desk in early 2014, including issues related to employee shifts, setting up "lines," and hiring. It is also significant that he travelled to New York on business

during this time, as evidenced by Exhibit D. Exhibits F through I further underscore his managing of John Ward, a U.S.-based broker; Woolfenden requested reports and feedback ranging from casual updates to business plans.

Woolfenden argues that these contacts are not jurisdictionally significant because there is no evidence that brokers in London contacted New York clients, or that Woolfenden directed anyone to do anything; Woolfenden also argues that the New York desk's clients may not be traders in the United States. (May 6 Letter at 4.) These arguments fail. The emails -- in both tone and content -- show Woolfenden's close involvement with the running of the LATAM desk, which, again, was located in the United States. For the purposes of jurisdiction, Woolfenden exercised supervision and control over employees in the United States, and the CFTC's claims are related to those contacts.[9]

The CFTC further alleges in the Complaint that Woolfenden was well aware of the flying and printing practices in New York and did not take action to stop it. The Complaint

---

[9] These exhibits also provide support for the CFTC's argument in its February 22 Letter that Woolfenden supervised London-based brokers who flew prices and printed trades to U.S. clients while assisting the LATAM desk in early 2014. (See Complaint ¶¶ 84-85, 90-93.) While the Complaint does not explicitly tie Woolfenden to these London-based brokers, apart from the allegation that he had control and supervisory responsibilities over the Emerging Markets desk in London (Complaint ¶ 139), Exhibits A-D show Woolfenden's involvement in the staffing of London-based brokers on the LATAM desk.

quotes two messages from July 2014 to Woolfenden from a New York-based broker expressing concern about how much flying and printing was occurring. Woolfenden responded that the broker made a valid point and forwarded the email to Dibbs. The Complaint also quotes one message from January 2015 from the same broker offering to print and fly more aggressively, and another message from June 2015 referring again to the LATAM desk's practice of flying prices. Exhibits F, K, and L provide strong support for these allegations and show Woolfenden acknowledging the practices of flying and printing -- and while the exchanges in the exhibits do not appear to be specific to trading in the United States, they are more than sufficient to show that Woolfenden was aware of the practices.

Woolfenden argues that communications to him from the United States do not create jurisdiction because he did not create those communications, see February 11 Letter at 2, but the import here is the substance of the communications and the knowledge that the communications transmitted to Woolfenden -- knowledge that goes to the heart of the CFTC's causes of action. Accord Sullivan v. Barclays PLC, No. 13-cv-2811, 2017 WL 685570, at *45 (S.D.N.Y. 2017) (jurisdiction over foreign bank not warranted where the complaint did not

allege that the bank "directly communicated with any United States co-conspirator" about rate-fixing); id. at *48 (no personal jurisdiction where the complaint "fails to allege any United States connection to the alleged communications").

Similarly, Woolfenden argues that his own communications to U.S.-based brokers do not create jurisdiction because courts look at a defendant's contacts with the forum itself and not persons who reside there, see February 11 Letter at 2, but this argument also fails. For one thing, it is difficult to imagine how a defendant might have contact with a country without having contact with the people inside it. The *presence* of contacts with individuals -- while not necessarily sufficient -- is thus unremarkable. And contacts with individuals in a certain forum can certainly translate to contact with the forum itself if, as here, the defendant is taking action that affects the forum through his contacts with the individuals.

The cases cited by Woolfenden are inapposite to the extent they involved personal relationships that had effects only on the individuals and not the forum. E.g., Walden v. Fiore, 571 U.S. 277, 285 (2014) ("[T]he plaintiff cannot be the only link between the defendant and the forum."); DirecTV Latin Am., LLC v. Park 610, LLC, 691 F. Supp. 2d 405, 422-23

(S.D.N.Y. 2010) (phone calls to New York insufficient to establish personal jurisdiction under the state's long-arm statute where the "center of gravity" of the transaction was outside New York).[10] In contrast, Woolfenden communicated with U.S.-based brokers precisely because he wanted them to take some sort of action; that is the usual purpose of a business communication. (E.g., Giglio Decl. Ex. A (arranging staffing), Ex. L ("Please never admit to clients that we have ever flown rates . . . .").) These communications constitute conduct "expressly directed . . . at the United States." AmTrust Fin. Servs., Inc. v. Lacchini, 260 F. Supp. 3d 316, 333 (S.D.N.Y. 2017); id. (jurisdiction permitted when "the conduct at issue was aimed at causing effects in the United States").

In short, Woolfenden's contacts with the United States were not "random, fortuitous, or attenuated." (February 11 Letter at 1 (quoting Walden, 571 U.S. at 286).) Rather, they

---

[10] Several cases cited by Woolfenden are unpersuasive because they demonstrate only that the complaint must allege more than "occasional electronic communications." (See March 21 Letter at 2 (citing Wego Chem. & Mineral Corp. v. Magnablend Inc., 945 F. Supp. 2d 377, 386 (E.D.N.Y. 2013)).) First, the CFTC is not expected (and not required) to cite to every email in its possession, and the emails in the record demonstrate that Woolfenden had an active relationship with the U.S.-based brokers he supervised. Second, the CFTC alleges that Woolfenden sent at least 125 emails to then-current or prospective New York-based brokers between January 6, 2014 and November 9, 2015, which -- while perhaps not enough on its own to demonstrate supervision -- is much more than "occasional" contact. Giglio Decl. ¶ 5.

were the kinds of contacts that arise from a supervisory position. At this stage of the litigation, the CFTC has made a prima facie case that these contacts are sufficient to establish personal jurisdiction over Woolfenden.

c. Causation

The Court next turns to Woolfenden's argument, raised for the first time in the May 6 Letter, that the CFTC has failed to demonstrate that Woolfenden's contacts with the United States proximately caused the alleged injuries. (May 6 Letter at 6 (citing SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 344 (2d Cir. 2018)).) Woolfenden argues that "[n]one of the alleged contacts set forth in the Complaint or exhibits proximately caused the claims in counts One, Two, Three, or Four." (Id.)

For several reasons, the Court disagrees with both Woolfenden's analysis and his conclusion. First, Woolfenden misconstrues the case law. It is not entirely clear that the Second Circuit has ever adopted the proximate causation standard urged by Woolfenden. In the case cited by Woolfenden, SPV Osus Ltd. v. UBS AG, the Second Circuit relied on Chew v. Dietrich in noting that the proximate causation standard "may be appropriate" if the defendant's contacts with the forum are limited. 882 F.3d at 344 (quoting Chew, 143 F.3d at 29).

But although the court's opinion in Chew v. Dietrich compared the practices of several circuits and suggested that if a defendant "had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts," 143 F.3d at 29, the court "expressly declined to adopt such a standard" across the board. Straub, 921 F. Supp. 2d at 254 n.6. And SPV Osus Ltd. reaffirmed the need for case-specific inquiry in determining whether the "defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." 882 F.3d at 344 (quoting Walden, 571 U.S. at 284).

While a recent decision from this Court interpreted SPV Osus Ltd. as requiring a determination of the amount of contacts and then the application of either the proximate causation or "but for" tests, depending on the amount of contacts, the Court relied in part on the many similarities between the case before it and the Second Circuit opinion. SPV Osus Ltd. v. UniCredit Bank Austria, No. 18-cv-3497, 2019 WL 1438163, at *6 (S.D.N.Y. Mar. 30, 2019) (noting that both cases related to the Madoff ponzi scheme litigation).

In any event, Woolfenden's contacts with the United States were not so limited that the Court is persuaded to use

the "proximate causation" test. As detailed above, his involvement in the oversight of U.S.-based brokers and his earlier trip to the United States amount to far more than the "handful of communications and transfers of funds" at issue in SPV Osus Ltd. v. UBS AG. 882 F.3d at 345.

More importantly, however, even if the Court determined that Woolfenden's contacts were so limited as to necessitate a finding of proximate cause, the CFTC *has* alleged that Woolfenden's contacts proximately caused the alleged injuries.[11] Perhaps most strikingly, the CFTC alleges that Woolfenden's visit to the United States in 2007 led to his encouragement of flying and printing, and the exhibits of his emails and text messages with U.S.-based brokers demonstrate an awareness of the practices, which, the CFTC alleges, he did nothing to end. Thus, the CFTC has sufficiently alleged proximate causation.

d. Reasonableness Inquiry

Finally, the Court addresses the second component of personal jurisdiction: Whether the exercise of personal jurisdiction over Woolfenden comports with "traditional notions of fair play and substantial justice." In re Terrorist

[11] The Court notes that the CFTC refers to an "articulable nexus," which is the standard for the business transaction subsection of the New York long-arm statute, C.P.L.R. § 302(a)(1). (April 19 Letter at 2 (citing Cohen v. BMW Invs. L.P., 144 F. Supp. 3d 492, 497 (S.D.N.Y. 2015)).)

Attacks, 714 F.3d at 673. To be sure, the defendant lives and works in the U.K. But while Woolfenden argues that submitting to U.S. jurisdiction would be "an extraordinary financial, emotional, and logistical burden," he makes no particularized showing of why the burden should be so great, apart from the understandable difficulties arising from geographical distance. (May 6 Letter at 10.) Unlike the defendant in Sharef, there is no evidence of advanced age or lack of English language skills, both of which could militate against exercising jurisdiction. 924 F. Supp. 2d at 548. Given the allegations in the Complaint that Woolfenden was aware of the New York desk's practice of flying and printing trades, the Court is persuaded that its exercise of personal jurisdiction over Woolfenden comports with traditional notions of fair play and substantial justice.

C. THE CORPORATE DEFENDANTS AND DIBB

As previously noted, the Court has received the pre-motion letter exchanges from the Corporate Defendants and Dibb, each of which also contemplates a motion to dismiss the Complaint. The Court held a telephone conference with counsel for the Corporate Defendants and counsel for Dibb on April 4, 2019 (the "April 4 Telephone Conference"). (See Dkt. Minute Entry dated 4/5/2019.) During the April 4 Telephone

Conference, the Court indicated to the parties its preliminary view that the Complaint alleges sufficient facts to survive a Rule 12(b)(6) motion to dismiss. However, the Court also indicated that it would entertain further argument regarding Count III of the Complaint, which alleges that TFS-ICAP entered into and confirmed fictitious sales and transactions used to cause the reporting of untrue and non-bona fide prices. The Court therefore afforded Dibb the opportunity to submit an additional three-page letter regarding his arguments for dismissal of Count III of the Complaint, and the Court also afforded the CFTC an opportunity to respond to Dibb's supplemental letter, if any. The Court did not indicate a deadline for submission of those supplemental letters, and it has not received any such submissions to date. Accordingly, the Court now sets forth deadlines for those submissions: Dibb may submit a three-page letter on the issue of Count III of the Complaint by seven days from the date of entry of this Order; and the CFTC may respond, in a three-page letter, by seven days from the date of Dibb's submission.

## IV. ORDER

Accordingly, it is hereby

**ORDERED** that the motion so deemed by the Court as filed by defendant Jeremy Woolfenden to dismiss (Dkt. Nos. 38, 43, 44, 48, and 49) the Complaint of plaintiff Commodity Futures Trading Commission ("CFTC") (Dkt. No. 5) pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure is **DENIED.** It is further

**ORDERED** that if defendant Ian Dibb ("Dibb") wishes to supplement his prior letter exchange regarding dismissal of the Complaint, he may submit a three-page letter on the issue of Count III of the Complaint by seven days from the date of entry of this Order; and the CFTC may submit a three-page letter in response by seven days from the date of Dibb's submission.

**SO ORDERED.**

Dated: New York, New York
20 November 2019

Victor Marrero
U.S.D.J.